Rockingham
No. 2001-047

IN THE MATTER OF IRVIN D. GORDON AND PRISCILLA M. GORDON

Argued: February 13, 2002
Opinion Issued: May 10, 2002

*Sheehan Phinney Bass + Green, P.A.*, of Manchester (*James E. Higgins* on the brief and orally), for the plaintiff.

*Wiggin & Nourie, PA*, of Manchester (*L. Jonathan Ross* and *Doreen F. Connor* on the brief, and *Ms. Connor* orally), for the defendant.

NADEAU, J. The plaintiff, Irvin D. Gordon (Husband), appeals certain findings and rulings recommended by the Marital Master (*Pamela D. Kelly*, Esq.) and approved by the Superior Court (*Galway*, J.) in his divorce decree. The master found the following facts: Husband and the defendant, Priscilla M. Gordon (Wife), were married in 1986. They have one child together and Wife has two children from a prior marriage. Both parties sought a divorce on grounds of irreconcilable differences.

We will uphold the trial court's findings and rulings unless they lack evidential support or are legally erroneous. *See In the Matter of Fowler and Fowler*, 145 N.H. 516, 519 (2000). "The trial court has broad discretion in determining and ordering the distribution of property and the payment of alimony in fashioning a final divorce decree." *Id.* We will not overturn the trial court's ruling unless its exercise of that discretion is unsustainable. *See id.*; *State v. Lambert*, 147 N.H. 295, 296 (2001) (setting forth unsustainable exercise of discretion standard).

Husband, an attorney, raises a number of issues on appeal. First, he contends that the master erred in valuing his "ceased member" interest in his law firm. The master found that as a member of his law firm, he would be entitled to receive a "ceased member" interest upon his death or resignation from the firm, in an amount determined under a computation prescribed in the firm's membership agreement. Each party introduced expert testimony as to the value of the ceased member interest. Husband's expert calculated the fair market value of that interest by determining the present value of the three annual payments he expected Husband would receive after his retirement in 2013. He did so by starting with Husband's share of the firm's current valuation, projecting that value forward to 2013, and then discounting back to present value three payments, each one third of the projected future value of Husband's interest in the firm, that he expected him to receive in 2014, 2015 and 2016. The expert also deducted the present value of taxes he expected would be due upon receipt of those payments. He arrived at a value of $25,438.

Wife's expert, on the other hand, valued Husband's interest as if he were to retire today. He determined a present value of either $184,977 or $166,339, depending upon whether the calculation was made using the firm's tax return or financial statements, respectively. The master accepted the Wife's expert's valuation method. Husband argues that the master erred in valuing his ceased member interest as if he had already retired or died. He notes his uncontradicted testimony that he is in good health and does not intend to leave the firm until 2013. He then contends that "both New Hampshire law ... and accepted economic principles" require that his ceased member interest be discounted to reflect the time value of money.

Husband correctly notes that courts generally use fair market value in determining an appropriate division of property in divorce proceedings. *See Rattee v. Rattee*, 146 N.H. 44, 50 (2001). "Fair market value is the price a willing buyer and a willing seller would probably arrive at through fair negotiations, taking into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining." *Id.* (quotation omitted). Husband's expert's valuation method

posited a sale to a third party today of his right to receive his ceased member interest in the future. His expert therefore employed a discount factor that reflected the "layers of return" a third-party investor would require to compensate for the risks he was undertaking, such as the risk involved in investing in the equity of a company.

Wife's expert, on the other hand, reasoned that there is no need to look for a hypothetical willing buyer when Husband's firm is required to "buy" his ceased member interest, at the price determined under the membership agreement, whenever he chooses to withdraw from the firm. Moreover, Husband's expert agreed that he cannot sell his interest in the firm to anyone other than the firm. Both experts testified that he could retire now if he chose to do so, and the master found that he is "entitled to be paid his ceased member's share earlier than his retirement age if he leaves the firm prior to that date." Although the master found that the membership agreement "provid[ed] substantial disincentives to withdraw and practice law in competition with [the firm]," testimony indicated that it was speculative at best whether and how such disincentives would or could be applied to Husband.

■ We have adopted the view that "the trial court has wide discretion in determining the date on which a value should be placed on marital assets." *Hillebrand v. Hillebrand*, 130 N.H. 520, 523-24 (1988). We conclude that the trial court sustainably exercised its discretion in valuing Husband's ceased member interest in an amount he could realize today, even though he may choose not to do so. "The fact that an actual sale of [Husband's] interest in the company was not contemplated at the time of the final hearing is irrelevant to the concept of fair market value." *Rattee*, 146 N.H. at 51. The court could have found such a valuation more reasonable than one based upon a hypothetical sale that Husband's own expert admitted could not take place. The court also could have found it more equitable to adopt Wife's higher valuation, which Husband has the present ability to realize at his sole election, rather than one severely discounted to reflect future uncertainties and their attendant risks, which, again, are predicated upon Husband's sole election not to retire at the present time.

■ Husband next contends that the master erred by including in the division of his retirement accounts amounts attributable to contributions made prior to the marriage and after the libel for divorce. He argues his retirement accounts, specifically an IRA and a 401(k) account, should have been divided in accordance with the rule developed in *Hodgins v. Hodgins*, 126 N.H. 711 (1985), and reiterated in subsequent cases, that "only those pension benefits which are attributable to the retiree's employment during

the marriage are subject to distribution." *Rothbart v. Rothbart*, 141 N.H. 71, 75 (1996) (quotation omitted).

Wife argues that RSA 458:16-a (Supp. 2001) governs distribution of the retirement accounts. We agree.

RSA 458:16-a, I, provides:

> Property shall include all tangible and intangible property and assets, real or personal, belonging to either or both parties, whether title to the property is held in the name of either or both parties. Intangible property includes, but is not limited to, employment benefits, vested and non-vested pension or other retirement benefits, or savings plans. To the extent permitted by federal law, property shall include military retirement and veterans' disability benefits.

Section II then provides, in part, that upon a decree of dissolution of marriage, "the court may order an equitable division of property between the parties." RSA 458:16-a, II. "When read in conjunction, paragraphs I and II show the legislature's intention that marital property includes any property acquired up to the date of a decree of legal separation or divorce." *Holliday v. Holliday*, 139 N.H. 213, 215 (1994). The retirement accounts at issue were acquired prior to the date of divorce. Accordingly, we find no error.

■ Husband next argues that the master erred in excluding Wife's interest in a family trust from the marital estate. The master found that Wife had an interest in a family trust established by her mother, who is now deceased. The master found that her "remainder interest in any assets of this trust is conditioned on her surviving her father, and the trust funds not having been expended for his needs during his lifetime." The master concluded that her interest in the trust was speculative and did not include it in the marital estate.

Husband argues that Wife's interest in the trust should have been included in the marital estate in accordance with *Flaherty v. Flaherty*, 138 N.H. 337, 340 (1994). We need not address this argument because the master made an alternative ruling, which Husband has not challenged, awarding Wife's interest in her mother's trust "solely to her as a matter of equitable division in this divorce." Indeed, we note that Husband's own requested findings of fact and rulings of law sought to award Wife "her interest in the Trust from the marital estate, free and clear of any claim of [Husband]."

■ Husband also argues that the master erred in awarding a fund given to Wife by her mother, allegedly for the purpose of paying for the children's higher education, solely to her, while at the same time requiring him alone to pay for their son's college education. Husband argues:

> In short, it was error for the master, having accepted Wife's testimony that the A.G. Edwards account funds were to be applied for the *"children's"* education, to then rule that the funds were to be awarded solely to Wife without any obligation to apply any portion of them for the children's education, while simultaneously shifting responsibility for the parties' son's college education exclusively to the appellant.

We disagree. First, the master did not accept Wife's testimony that the funds "were impressed with an oral trust" for the education of her children from her former marriage. The master found "no circumstantial guarantees of trustworthiness" in her testimony about the oral trust and declined to exclude the funds from the marital estate. The master nevertheless concluded:

> Under the circumstances, the fact that the funds represent a gift from a family member in anticipation of death and they have been treated by the parties as separate property compels the master to conclude that they ought to be awarded exclusively to Wife, thus creating an unequal but equitable property division under the provisions of RSA 458:16-a(II)(n).

Moreover, we note that Husband himself requested a ruling that the fund be awarded to Wife free and clear of any claim by him. He also testified that he was willing to accept responsibility for his son's higher education. Accordingly, we find no error.

Husband next contends that the master erred when, in dividing the parties' property and awarding alimony and child support, she assumed that Wife was entitled to be maintained at the standard of living enjoyed during the marriage irrespective of his available income and standard of living. He argues that no New Hampshire case or statute stands for the proposition that a spouse is entitled to support in order to continue in the standard of living to which she became accustomed during the marriage. Rather, he argues, the "style of living" during the marriage is a circumstance to be taken into account in determining whether the reasonable needs of the party seeking alimony can be met in the absence of alimony. *See* RSA 458:19, I(a). He also asserts that given the duplication of expenses necessitated by the division of one household into two, it is

impossible for both parties to enjoy, post-divorce, the standard of living to which they became accustomed during the marriage.

■ We first note that the master invoked the marital standard of living only in connection with the award of alimony. We therefore reject Husband's contention that the error he alleges also tainted the division of property and the child support award. We acknowledge that the master stated, quoting *Fowler*, 145 N.H. at 521, that she "considered that the parties enjoyed a comfortable lifestyle and that Wife is entitled to financial assistance from Husband in order to 'enjoy the standard of living to which she was long accustomed in her marriage.'" We do not, however, interpret this statement as expressing a belief by the master that Husband would have been required, under any circumstances, to maintain Wife at the standard of living enjoyed during the marriage. Rather, the master's recommended order as a whole reveals that the master considered a number of factors, including Wife's need for alimony while pursuing her education, and Husband's current ability to pay alimony. In particular, the court noted that she earns just over $800 a month while his monthly income is approximately $13,000. We detect neither legal error nor an unsustainable exercise of discretion in the master's award of alimony in the amount of $2,000 per month for the first two years after the divorce and $1,000 per month for the following three years.

Finally, Husband argues that the master erred in awarding child support by: (1) failing to determine the amount presumptively payable under the child support guidelines set forth in RSA chapter 458-C; and (2) after finding that an adjustment in child support was warranted, failing to make an adequate adjustment.

■ Our child support statute, RSA chapter 458-C, "clearly mandates that the superior court either apply the guidelines to determine the parties' respective support obligations, or make a specific finding on the record that application of the guidelines would be unjust or inappropriate." *Giles v. Giles*, 136 N.H. 540, 544 (1992); *see also* RSA 458-C:4, II. The decree of divorce contains no findings regarding child support, but rather refers to an accompanying uniform support order. The uniform support order, in turn, is a standardized form that provides three choices regarding compliance with the child support guidelines: (1) the award does comply; (2) it cannot be determined whether the award complies because the obligor defaulted and therefore a reasonable estimate of the obligor's income was used; and (3) an adjustment from the guidelines amount was warranted by special circumstances, which are to be explained in the space

provided. The third choice was selected and "shared custody" was provided as an explanation.

We hold that this terse explanation, unaccompanied by additional findings, does not satisfy the requirement for a "specific finding on the record that application of the guidelines would be unjust or inappropriate." *Giles*, 136 N.H. at 544. We therefore vacate the child support order and remand to the trial court for specific findings explaining whether it finds application of the guidelines unjust or inappropriate, and, if so, explaining any adjustment it makes to the application of the guidelines. *See* RSA 458-C:5 (Supp. 2001).

Husband argues that the trial court also erred in failing to calculate the amount presumptively payable under the child support guidelines. He cites federal regulations governing coverage of state child support enforcement programs under title IV-D of the Social Security Act, which provide in part: "Findings that rebut the guidelines shall state the amount of support that would have been required under the guidelines and include a justification of why the order varies from the guidelines." 45 C.F.R. § 302.56(g) (2001); *see also* 45 C.F.R. § 301.3 (2001). We note, however, that our state statutes do not explicitly require trial courts to calculate the guidelines award before determining that an adjustment would be appropriate. *See* RSA 458-C:4, II; :5. We nevertheless conclude, irrespective of federal requirements, that a specific finding as to the amount of child support that would be generated under the guidelines will facilitate our review of a finding that application of the guidelines would be unjust or inappropriate. We therefore instruct the court on remand to make a specific finding as to the amount of child support presumptively payable under the guidelines. *See* RSA 458-C:4, II.

Because we remand the child support issue for further findings, we need not address Husband's remaining arguments on that issue.

*Affirmed in part; vacated in part; remanded.*

BROCK, C.J., and DALIANIS and DUGGAN, JJ., concurred.